**HARRIES et al. v. AIR KING PRODUCTS CO., Inc.**

Civ. A. No. 8725.

United States District Court
E. D. New York.

Dec. 5, 1949.

Kenyon & Kenyon, New York City (Theodore S. Kenyon, Ralph L. Chappell, Joseph C. Sweet, Jr., New York City, of counsel), for plaintiffs.

Spence, Hotchkiss, Parker & Duryee, New York City (Stephen H. Philbin, John Farley, Ernest Angell, New York City, of counsel), for defendant.

GALSTON, District Judge.

This patent infringement suit involves patents No. 2,045,525, 2,045,526 and 2,045,-527, all granted on June 23, 1936 to the plaintiff, J. H. Owen Harries, the inventor. Throughout the trial and in the briefs, for convenience, these patents were referred to as '525, '526 and '527, and in the course of this opinion the same designations will be adopted. Harries Thermionics (Overseas) Ltd., the other named plaintiff, is the exclusive licensee of the patentee.

The defendant is a radio set manufacturer and is a wholly owned subsidiary of Hytron Radio & Electronics Corporation, a tube manufacturer licensed under patents of Radio Corporation of America. Infringement of the patents is charged and denied. The issues involve the validity and the infringement of the three patents.

The patents relate to electronic or radio tubes and embody different aspects of the same invention. The '525 patent is for a method of producing and controlling space discharge. The '526 patent is for a multi-electrode tube apparatus, and '527 for electronic discharge tube, a division of the '525 patent application. Claims 1, 2, 17, 18, 21, 22, 37 and 38 of the '525 patent, claims 5, 6, 9 and 10 of the '526 patent and claims 5 and 8 of the '527 patent are in issue.

Of the '525 patent, claims 1 and 18 may be taken as typical. They read as follows:

"1. The method of controlling a stream of electrons in a discharge tube having an anode, a cathode and an auxiliary electrode therebetween which consists in energizing the cathode to produce a supply of primary electrons, applying positive potentials to said auxiliary electrode and anode to direct such electrons in the form of an electron stream to the anode and causing such stream of primary electrons to traverse a distance between the auxiliary electrode and the anode at least equal to about the critical distance at which the anode breakdown voltage at which the anode current becomes substantially saturated is in the neighborhood of the minimum whereby any secondary electrons radiated by said anode are prevented from reaching said auxiliary electrode even though the voltage of the anode becomes less than the voltage of the auxiliary electrode.

"18. The method according to claim 1 wherein the stream of electrons is confined to a path of limited cross-sectional area and said stream is caused to traverse a dis-

574

tance between said auxiliary electrode and anode approximating said critical distance."

Of the '526 patent, claims 9 and 10 may be taken as typical. They read as follows:

"9. An electron discharge device comprising a cathode, an anode having sections between which said cathode is interposed, a first and a second grid electrode having sections arranged between said cathode and anode sections, means for energizing said cathode to produce primary electrons, means for applying potentials to said second grid electrode and anode to direct said electrons in the form of streams to said anode sections, means for impressing voltages on said first grid electrode sections to vary the intensity of said electron streams, and means incorporated in said first grid electrode for confining said electron streams to paths having limited cross sections, said anode sections being spaced from said second grid electrode sections by a distance at least equal to about the critical distance at which the anode break-down voltage at which the anode current becomes substantially saturated is in the neighborhood of the minimum and secondary electrons radiated by said anode are prevented from reaching said auxiliary electrode even though the voltage of the anode becomes less than the voltage of said second grid electrode.

"10. An electron discharge device in accordance with claim 9 wherein said anode sections are spaced from said grid electrode by approximately the critical distance."

Claims 5 and 8 of the '527 patent read as follows:

"5. An electron discharge device having an anode, a cathode and an auxiliary electrode therebetween, the auxiliary electrode and the anode being spaced apart by a distance at least equal to about the critical distance at which the anode break-down voltage at which the anode current becomes substantially saturated is in the neighborhood of the minimum whereby any secondary electrons radiated by said anode are prevented from reaching said auxiliary electrode even though the voltage applied to said anode is less than the voltage applied to said auxiliary electrode, and elec-

tron focusing means between said cathode and anode.

"8. An electron discharge device according to claim 5 wherein the distance between the auxiliary electrode and the anode is approximately equal to said critical distance."

The claims will be best understood by a discussion of the specifications.

The inventor states, in '525, that the invention relates to the production and control of ionic streams particularly to discharge tubes in which the current is varied in intensity, and "these variations are employed to energize a load usually connected in the anode circuit of the tube". It is said that in vacuum tubes the "streams of electrons the lengths of which are great in proportion to their cross sections, have the advantage that the capacities between electrodes can be greatly reduced," and "the undesirable retrograde movement of secondary electrons from the anode is prevented."

Of the prior art, Harries says: "Hitherto, however, the ratio between the voltage used to produce the space current, and the intensity of the current, in such streams of electrons which are long and small in cross section, has been so high that known apparatus worked by said streams of electrons have been unsuitable for practical use in incandescent cathode tubes and the like. Therefore, previous practice has been confined to the use of tubes with streams of electrons the lengths of which were comparatively short in proportion to their cross sections, (and which were produced by voltages which were comparatively small in proportion to the intensity of the current), although such tubes exhibited disadvantageously high capacities between the electrodes a tendency toward the undesirable retrograde movement of secondary electrons, and the streams therein cannot be deflected to any useful extent."

The drawings illustrate the apparatus employed to operate the invention. The essential elements consist of a cathode which is heated so as to emit electrons. A circular hood is arranged partly to enclose the cathode, leaving it open towards an accelerating electrode. The anode is so

mounted that the distance from the accelerating electrode may be adjusted. The operation of the tube is described with reference to figures of the patent which reveal characteristic curves of the apparatus.

Despite the length of the specification, which runs to six pages, and the forty-one claims that follow, it is not believed that it is an over-simplification of the Harries invention to state that Harries believed that the objectives which he sought were best obtained in an output power tube by focusing the electrons from the cathode into a long stream of relatively small cross section, and determining by the method defined in the patent "the critical distance"[1] between the accelerating electrode and the anode.

In the opening statement of counsel for the plaintiffs it was admitted that the latter condition, i.e. the determination of the proper distance between the accelerating electrode and the anode was not susceptible of mathematical solution, but depended solely on experiment. In the specification itself we find that the inventor states: "It will be realized by those skilled in the art that, as is usual in electron discharge tubes, the best design for an actual tube for given purpose is best found by experiment, and that the exact form of the characteristics will vary considerably with the exact electrode assemblies used, although they will have characteristics broadly as shown. For this reason the design of a tube for a given purpose is best approached by means of a series of tests with movable electrode arrangements such as that shown in Figure 1. By this means the best compromise between the various quantities and the most satisfactory type of electrode to use will be easily ascertained. The value of various quantities quoted are thus only given for purposes of explanation and it is understood that they may be varied widely without departing from the scope of the invention. A trial tube can be constructed with movable electrodes to determine the best electrode assembly."

At the outset there is then presented a critical issue in this case: is the claimed contribution of the plaintiff to the electronic art as disclosed in the three patents in suit of such a nature as to constitute invention? On the one hand it is argued for the plaintiffs that the mere absence of mathematical formulae to enable a tube designer to base a calculation to determine critical distance should not invalidate the patents. Nor, the plaintiffs claim, should invention be denied because the determination of the critical distance resolves itself into a matter of trial and error. Rather it is contended that the invention is a discovery, and though largely empirical, if not wholly so, and though, as was said in the opening statement of plaintiff's counsel, "the reasons why it works are not fully understood today", nevertheless if the teachings of the patents are followed the results will be obtained.

Of course, this view is challenged by the defendant. It is urged first that "critical distance" was old and its function understood in the prior art; secondly that "beaming" was old and likewise understood in the prior art; thirdly that the combination of critical distance and beaming is not a patentable combination but an aggregation of old features in which each acts as it did in the prior art. The defendant also contends that the claims of the '525 and '527 patents are invalid because they are empirical, experimental and functional.

1. The term "critical distance" is defined in the specification of the '525 patent as "the distance between the anode and an auxiliary electrode at which the anode break-down voltage at which the anode current becomes substantially saturated is in the neighborhood of the minimum whereby any secondary electrons radiated by said anode are prevented from reaching said auxiliary electrode; when the distance is shorter than this value secondary radiation, when produced at the anode, tends to pass to the auxiliary electrode (when the anode potential is less than that of the auxiliary electrode) and to produce a negative resistance characteristic; when the distance is longer than this value, then there is a range of anode voltages from zero upwards over which substantially no anode current tends to be produced, and immediately above this range, the anode current rises abruptly to a saturated value."

And the defendant's position as to the claims of the '526 patent is that they are invalid for the same reasons. It is said that the only difference between the beaming claims of the '525 and '527 patents, and those of the '526 patent is the addition in the last named patent of a control grid. Control grids in beam power tubes, the defendant claims, were well known prior to Harries.

It may be of profit, and certainly of interest, to follow the study made by Mr. Harries which culminated in the alleged invention. While living in Frinton-on-the Sea, Essex, England, he had the use of a wooden shed in the garden of his parents' home. While considering problems relating to television he concluded that there also existed a need "for a greatly improved radio tube to use in the circuit for transmitting and receiving television". In the early stages of his experiments he found that when he used a beam or jet of electrons sufficiently long and thin to move over selected contacts, he could not get enough current at sufficiently low voltage. Such a tube was useless. He then selected a cathode, which had a reasonable area of flat face in the direction in which he hoped to operate the stream of electrons. The flat spiral cathode was similar in conformation to the hair spring of a watch, such as is shown in Fig. 2 of patent '525. He used a cylindrical hood which he proposed to maintain at a negative or zero potential. The object was to push the electrons that had whirled from the cathode away from the cylindrical hood and in the required direction. Part of the assembly included a mesh or grid-like accelerating electrode to be maintained at a positive potential. The hood was similar to that indicated in the '525 patent, as was also the accelerating electrode. His next problem was to determine at what distance to space the anode to which the beam was to be directed. To solve that problem of distance he provided a movable anode which could be brought if necessary either close to the accelerating electrode, or at some considerable distance from it. The original experimental tube is no longer in existence, but he produced a duplicate of the tube, Exhibit 29 in the case.

A "B" battery was used, the negative end of which was connected to the cathode; he also connected the negative end of the battery to the hood. The accelerating electrode was connected to a point about one-third of the way up. It was maintained at a constant potential of 250 volts. The anode he connected to the battery at a higher voltage than 250. In the test that he made of the original of the tube, Exhibit 29, he spaced the anode at the longest distance that he could conveniently use in that structure, about 7 cm. After having fixed the distance, Mr. Harries then selected the anode voltage at zero as a starting point, and found that all the current of the electrons from the cathode went to the accelerating grid and none to the anode. Then the anode potential was raised to 200 volts, the accelerating electrode voltage remaining at 250. Again he found that there were few electrons reaching the anode and that the current to the accelerating electrode had fallen by a very small amount. The anode voltage was increased, but even at 500 volts the current on the anode meter had risen but slightly, while the current to the accelerating electrode had fallen proportionately. An additional anode voltage of 50 volts showed a slight increase of anode current and a decrease of accelerating electrode current. The anode potential was then raised to 600 volts and he found the anode current meter was reading almost the same, perhaps a little higher, whereas the accelerating electrode current had fallen just a little. Finally the anode voltage was raised to 1000, far more than he would have used in practice, with the result that the anode current was very slightly greater and the accelerating electrode current had again fallen.

Thus, having experimented with various applied anode voltages, with the accelerating grid voltage remaining constant, and the distance of the anode from the accelerating grid always at 7 cm., the inventor experimented with variations in the distance between the accelerating grid and the anode. The cathode was maintained at the same temperature as before, the voltage on the hood was the same, namely zero, the accelerating electrode voltage 250, and the

anode potential was varied from zero to 1000 volts. The result of these various tests led Mr. Harries to believe that one could get increased power output from a tube in which the anode break-down voltage[2] is lower than the screen voltage for a given applied battery voltage. In other words, this higher power output was obtainable with the use of the lower voltage battery.

It is plaintiff's position also that owing to this combination of the electronic stream and the critical distance, secondary electrons from the anode to the nearest electrode are suppressed, which it is claimed makes higher output power obtainable.

On the other hand, it is the position of the defendant that the patents lack patentable invention because both critical distance and focusing were old in the art and their effects well understood.

In respect to critical distance, the defendant relies on Hull, Patent No. 1,387,984; an article by Gill in The Philosophical Magazine; an article by Tonks in the Physical Review; a French patent to Philips, No. 629,357; Wade British patent No. 287,958; Holst United States patent No. 1,945,040 and Holst Danish patent No. 42,375; and the spacing in early pentodes including the R. C. A. 238 tube.

The Hull patent was issued August 16, 1921, and relates to negative resistance. This patent shows a tube having a cathode, a positive grid and an anode. It is interesting to note that in this highly evacuated tube Hull says that: "The relative positions of the three electrodes may be varied in order to vary the operating characteristics of the device."

I think this goes to the heart of the matter of critical distance, for here we have a clear appreciation that operation of a tube is related to the distances between electrodes. Defendant's expert witness, Herold, referring to this patent, said: "When the anode potential is close to the cathode potential the electrons just about can get to the anode, and the anode collects some of the electron current. As the anode voltage is raised the electrons strike it with greater and greater impact velocity and release secondary electrons, and these secondary electrons are attracted by the positive potential of the helical wire grid and pass over to it and are caught by it, so that one has in this too a current from the cathode flowing to this outer cylindrical member, flowing back toward the screen grid."

In the Hull patent the desire of the inventor is to have the secondary electrons go back from the anode to the positive or screen grid. The object is to provide negative resistance. It is, of course, true that in the beam power tubes, which are challenged in this action, the effort is, as Mr. Harries described, to get rid as much as possible of the secondary electrons. But the important thing to pass on as bearing on the question of invention is that irrespective of Hull's object as contrasted with the object of the beam power tube manufacturers and Harries, Hull recognizes the significance of proper relative spacings of the electrodes in a vacuum tube.

In The Philosophical Magazine (1925) Gill wrote an article entitled "A Space Charge Effect". Professor Weber, another expert witness called by the defendant, referring to this article, said that as shown in Fig. 3, if a grid potential of 40 volts and an anode potential of 12 volts be selected and the emission current raised, the plate current will vary along the uppermost straight line until it reaches a limit "and a further increase—increase of emission current—causes a very sharp drop to a lower value of plate current". On page 1005 the article reads: "The maximum current which can flow to the plate[3] gets less as the distance between the grid and the plate is increased, and if the plate diameter is about three times the diameter of the grid, it becomes possible to pass through the grid more current than the space can

---

2. Anode break-down voltage ($E_b$) is a term used in the '525 patent. "The anode voltage at which the anode current becomes saturated will be referred to as the 'break-down' voltage of the tube." Pat. '525, p. 2, 11. 26–28.

3. Anode.

carry, and the drop in the plate current will occur."

Gill discusses secondary emission of electrons from the plate due to the impact of the primary electrons, and says: "For any value of the current passing the grid greater than that which caused the potential distribution * * * the force of the plate tends to take electrons back to it, and therefore for all these currents the usual effects due to secondary emission will be absent (unless there is an appreciable velocity of emission)."

So it would appear that the Gill article also discloses that with respect to the number of secondary electrons from the anode that could get to the grid, the distance between electrodes is important.

The Philips French patent No. 629,357, published November 9, 1927, states that the invention consists in providing means "by which, at the time of a diminution of the anode potential, the increase of the current of the protective grid at the expense of the anode current is appreciably avoided.

"* * * among these means there are some which were particularly well suited because of their simplicity * * * especially the following:

"(3) One uses as final amplifier a discharge tube having at least two auxiliary electrodes between the cathode and the anode, the distance between the anode and the exterior auxiliary electrode being great enough so that the electrons originating, if such be the case, from the anode, are prevented by the space charge from passing to the said auxiliary electrode."

Fig. 1 of the French patent discloses a structure having in addition to the cathode and anode, a control grid, a screen grid and a third grid. This type is known as a pentode, having five electrodes in all. One of these grids, that designated Fig. 4, nearest the anode, serves as a suppressor grid for the purpose of preventing secondaries from coming from the anode. The description of the prior art in the French publication shows that the inventor was confront-ed with problems not unlike those considered by Harries; for example, as Mr. Herold testified, it is pointed out that in an output tube, it is desirable to have the anode current rise. The translation of the French patent recites: "It is known that when it is a question of using these contrivances [4] for the purpose of amplification, a great slope of the characteristic curve is advantageous. With the ordinary triodes, the slope of the static characteristic curve diminishes rather appreciably when oscillations are impressed upon the principal or directing grid (managing or control grid), in view of the fact that after transmission to the anode these oscillations are amplified while at the same time being nevertheless an opposite phase, so that an increase of the grid potential gives rise to an increase of the anode current, while on the contrary the latter declines under the effect of a diminution of the anode potential."

The inventor continues: "For the purpose of obviating this drawback * * * one may arrange a so-called 'protective' grid between the principal grid and the anode."

Reference to the United States patent to Holst, No. 1,945,040, which covers the same invention, perhaps throws additional light in support of Herold's interpretations, for here we find in claim 1, a reference to an electron discharge device comprising cathode, anode, control grid and a screen grid interposed between cathode and anode, and "means for producing a region of constant relatively low potential in the space between the screen grid and the anode for preventing the emission of secondary electrons from the anode"; whereas article claims 2 to 20, inclusive, and claim 26, specify three electrodes between cathode and anode, as does claim 21, which defines the circuit. The method claims on the other hand, 22 to 25, inclusive, have no such specific limitation, for example, claim 22 reads: "The method of eliminating the effects of secondary electron emission between the screen grid and plate electrodes of a screen grid tube

4. Thermionic contrivances.

which consists in maintaining between said screen grid and said plate a region of constant space potential lower than the potential of either said screen grid or plate."

However much Harries may point to shortcomings in the Philips tubes, which he constructed pursuant to the instruction of the Philips and British Wade patents, with center assemblies embodying cathode, control grid and accelerating electrode, it does not follow that the Philips patents are to be disregarded. If he found that the tubes he assembled without the suppressor grid and at varying anode distances were inoperative, the difficulty with that sort of evidence is that the Philips French patent and the derivative British Wade patent, the Holst Danish patent and the Holst U. S. patent are not offered as anticipations of the Harries invention. Therefore it is not essential that the devices of the patent be demonstrated to be operative in the manner of the Harries invention. It is, of course, trite to observe that success in the arts and sciences frequently has its source in repeated failures. Here the consideration is what the prior art had taught in respect to those matters which are emphasized as Harries' contribution to the electronic art.

The Philips French patent is important because therein is a clear instruction that the distance between the anode and the exterior auxiliary electrode should be great enough to suppress secondary electrons. Similar passages are found in the related Wade British patent, No. 287,958, the Holst U. S. patent No. 1,945,040 and the Danish patent No. 42,375, and as I read these patents it seems to me that the passages apply to a four-electrode tube, and not merely to the Philips pentode.

The Robinson British patent No. 364,098, filed September 26, 1930, accepted December 28, 1931, discloses a pentode which includes a suppressor grid. It is interesting to note that the inventor, like Harries, "experimented" to get the best results: The optimum grid pitch will, of course, be dependent upon the diameter of the grid wire of the outer grid, the spacing of the elec-

trodes, and the potential for which the valve is intended to operate, but the optimum grid pitch to give the maximum permissible anode voltage swing and the minimum production of harmonics, particularly the third harmonics, *can be determined experimentally without difficulty to meet any particular set of other conditions."* [5]

In addition to these patents, some early articles demonstrate that secondary electrons could be suppressed dependent upon the "distance between the anode and the exterior auxiliary electrode". So much was said in Radio Broadcast in an article by Friedrich Oskar Rothy in a discussion of "Development of the Pentode Tube" in the issue of December, 1929. So too in an article by Benedict V. K. French, in Electronics, of April, 1930, the author says: "The mesh and spacing of the three grids have a pronounced effect upon the characteristics of the tube and present a fruitful field for experimentation."

In The Wireless World, issue of May 28, 1930, there is a discussion of "The First Indirectly Heated Pentode". It is said: "Owing to the remarkably large output that can be obtained with quite a modest input, the pentode valve is gaining in popularity."

Herold testified that the 1931 R. C. A. 238 pentode showed that the anode was placed in the best position. Nevertheless if the foregoing references disclose that prior to Harries the art knew the importance of relative positions of the anode and the nearest electrode, it must be admitted that in none of those patents, publications and use does it appear that the advantage of beaming or focusing of the electrons was explicity set forth, though in the Sabbah patent, No. 1,927,807, which will be considered presently, there does seem to be a recognition and understanding of both principles.

So the defendant has offered other prior art for the purpose of demonstrating that focusing or beaming was old.

In patent to Van der Bijl, No. 1,613,626, issued January 11, 1927, it is said: "It has been found, however, that ions or electrons passing from the cathode 2 to the electrode

5. Emphasis mine.

4 tend to be too much dispersed. To overcome this difficulty it is proposed to employ a screening or directing or focusing element to limit the cross-sectional area of the stream of electrons."

Van der Bijl provided a plate having an elongated opening through which electrons may pass. This opening was directly aligned with the cathode and anode "so that the electrons passing to the anode will be in a comparatively narrow band or stream".

Turning to Langmuir patent, No. 1,558, 437, issued October 20, 1925, the inventor says:

"Surrounding the cathode is a concave dished plate 52, which is maintained negatively charged, conveniently by connecting it to the cathode by means of a conductor 53. This ring serves to modify the static field so as to focus the electrons into a fairly well-defined stream which passes through an aperture in the plate 47 to the anode.

"By maintaining the plate 47 positively charged, for example, by means of a battery 54, the passage of the electrons from the cathode to the anode is assisted."

Herold interprets the patent as disclosing that Langmuir sought to get more current for less voltage or greater current for the same voltage.

Patent No. 1,659,636, issued to Null on February 21, 1928, for amplifying voltage and current, discloses a device whereby the electrons pass from the cathode to two grids, then meet deflection plates on the way to grids 3 and 4, and finally impinge upon a metal plate T at the end of the tube. Then, as Herold testified, the electrons pass through this metal member to enter the gas chamber at the right. The gas chamber is the equivalent of the anode. This device shows a control of the passage of electrons through the use of deflection plates. The beam referred to is indicated by the letter E in Fig. 1 of the patent.

The space charge is the effect of the electrons in the space between the cathode and the anode.

The patent to Sabbah, No. 1,927,807, filed September 22, 1926, issued September 19, 1933, is for a space discharge apparatus, and was offered mainly to show that elements are present in the tube "to prevent spreading and deceleration of the electronic stream * * *".

The electrons emitted by the main cathode 2 are accelerated by the electrostatic field produced between the main cathode and anode by the source 7, and are directed into the funnel-shaped outlet of the main anode by the insulation member 9.

This patent, in addition to providing means for focusing the electronic stream, shows an appreciation of the effect of distance between electrodes. The inventor says: "The auxiliary anode 6 is spaced from the auxiliary cathode 4 at a distance which is preferably not greater than the mean free path of the electrons in the vessel and serves to accelerate the electrons."

Another early patent which shows focusing is that to Coolidge, 1,684,263, for a hot-cathode device, and here is found a hood around the cathode in an X-ray tube. In addition to this focusing provision, there seems also in this patent some recognition of the importance of considering the relative positions of cathode and anode and focusing device, for Coolidge says: "In accordance with another modification of my invention the cathode is so positioned with respect to the focusing device that electron emission from the entire cathode is controlled by space charge, so that for a given impressed voltage a given current is obtained regardless of variations of electron emission, provided that the emission of electrons always exceeds a pre-determined value for the given voltage.

Based on the proof that spacing of electrodes, i. e. critical distance, to get the best results in any particular case, and on the showing that focusing or beaming of an electronic stream were old, it is the contention of the defendant that the combined use of these two features of the prior art did not require patentable invention.

However, I do not think that the defendant has been successful in establishing that there was an aggregation and not a combination. It seems reasonably clear that focusing or beaming the electrons emitted from the cathode without critical distance

cannot achieve the object sought by Harries, i.e. suppression of secondary electrons at anode voltages below those of the accelerating grid voltages. Likewise, in the absence of beaming, the mere adjustment of distance does not yield that result. Yet the presence of the two conditions does bring about a co-operative result.

Nor can it be argued that the combination of these two electronic principles was the product of the mere skill of the electrical engineer. Though the elements of focusing and critical distance were available, no one had shown before Harries, through the means he employed, the effective suppression of secondary electrons as relatively low anode voltage and high current as compared with higher screen grid voltage and lower current.

■ The history of radio output electronic tubes shows the advance from diode to triode to tetrode to pentode, and to the beam power tube of the defendant, which is claimed by the defendant to be the equivalent of the pentode. Harries found certain deficiencies in output radio tubes which he sought to correct by the combination of cathode focusing of the electronic stream and a positioning of the anode at an effective distance from the accelerating grid. Apparently he was the first in the field to express the advantages of that combination and to that extent what he contributed to the art is entitled to be regarded as an invention.

■ Nor does the argument that because his work was largely experimental, and leaves trial and error to those skilled in the art to produce an operative device, negative the contention that inventive skill was involved. One skilled in the art as it was known at the time that Harries filed his applications could, by taking measurements of the current-voltage characteristics of the electronic stream at different anode distances be able to design a tube to achieve the Harries results. Such an electrical engineer or designer had available to

him in the laboratory either the use of the experimental tube, having a movable anode such as is described in the three patents in suit, or he could do what plaintiff's expert witness Kelley suggested, construct a series of tubes having different anode distances and operate each tube to determine the characteristic curves. It must be observed though that the only method shown in the patent '525 for determining effective operation of the circuit defined in the claims is confined to a triode, i. e. cathode, anode and accelerating grid, with the instruction that the cathode be heated so as to produce a stream of electrons, plus rods which enable the anode to be moved experimentally. In consequence it seems that the claims in suit must be so interpreted as to limit the method, whatever that method may be, to the circuit in a triode. And perhaps that is being over-generous in construction because as a matter of law the method referred to in all the claims in suit should be that method defined in the specification of which the drawings are part. There is nothing in the specification as I read it which justified the contention of Kelley that the designer is taught by this patent to make a number of test tubes so as to hit upon one in which the distance of the anode from the accelerating electrode is such as to yield the specific objectives defined in the Harries claims.

■ The attack on the claims on the ground that they are functional presents a more formidable objection and one which at the same time is more difficult to apply. The difficulty was recognized by Judge Learned Hand in Philip A. Hunt Co. v. Mallinckrodt Chemical Works, 2 Cir., 1949, 177 F.2d 583.

Judge Hand wrote: "A vast deal has been written about 'functional' claims and it must be owned that much of it cannot be reconciled with the rest; yet, in spite of the fact that the latest decisions of the Supreme Court[6] have declared with great strictness against them, we do not think

6. Holland Furniture Co. v. Perkins Glue Co., 277 U.S. 245, 48 S.Ct. 474, 72 L. Ed. 868; General Electric Co. v. Wabash Appliance Corp., 304 U.S. 364, 58 S.Ct. 899, 82 L.Ed. 1402; Halliburton Oil Well Cementing Co. v. Walker, 329 U.S. 1, 67 S.Ct. 6, 91 L.Ed. 3.

that form is inevitably determinative of validity. The question always is whether such claims extend the monopoly beyond the 'invention,' and that is not to be determined so simply."

Now in the endeavor to apply that test suggested by Judge Hand, it would be well to analyze a typical claim such as claim 1 of '525.

The claim refers to a method of controlling the stream of electrons in a discharge tube having:

a. An anode.

b. A cathode, and

c. An auxiliary electrode between cathode and anode.

Certainly the foregoing requirements are fully met in the specification. The claim then continues by describing the method:

a. Which consists in energizing the cathode to produce a supply of primary electrons.

b. Applying positive potentials to said auxiliary electrode and anode.

c. To direct such electrons in the form of an electron stream to the anode.

d. Causing such stream of primary electrons to traverse a distance between the auxiliary electrode and the anode.

e. Such distance to be at least equal to about "the critical distance at which the anode break-down voltage at which the anode current becomes substantially saturated is in the neighborhood of a minimum voltage".

f. To the end that any secondary electrons radiated by the anode are prevented from reaching the auxiliary electrode even when the voltage of the anode is less than the voltage of the auxiliary electrode.

Now of the foregoing steps of the method, the last named, "f", was so clearly functional that at the recent argument following the filing of the briefs, plaintiff's counsel conceded that the "whereby" clause or its equivalent in the various claims in suit could be disregarded as being merely surplusage. See Electro-Dynamic Co. v. Westinghouse Electric & Mfg. Co., C.C., 191 F. 506.

All of the other steps are encompassed within a fair meaning of the specification and thus would meet the test in Philip A. Hunt Co. v. Mallinckrodt Chemical Works, supra, with the possible exceptions that the term "substantially", as applied to saturated, used in the claims, is not defined in the specification, and its use in the claims may leave a residue of doubt. There is also weakness in the claim in respect to "critical distance", for no instruction or definition is afforded by the inventor beyond the test of the result to be achieved. Now, section 33, Title 35 U.S.C.A., requires that the description be "in such full, clear, concise, and exact terms as to enable any person skilled in the art * * * to make, construct, compound, and use the same; * * * and he shall particularly point out and distinctly claim the part, improvement, or combination which he claims as his invention or discovery."

This requirement of the statute does not, of course, mean that the terms must be so clear as to permit anyone who reads the specification to understand it. One must have in mind what was said in United Carbon Co. v. Binney & Smith Co., 317 U.S. 228, at page 233, 63 S.Ct. 165, at page 168, 87 L.Ed. 232, when Mr. Justice Jackson, speaking for the court, said: "Here, as in many other cases, it is difficult for persons not skilled in the art to measure the inclusions or to appreciate the distinctions which may exist in the words of a claim when read in the context of the art itself."

The electronic art is a particularly technical and scientific field and hence this specification and the claims must meet the understanding not of a layman, but of "any person skilled in the art or science to which it appertains".

So the measure of these claims must be whether they are sufficiently explicit to enable those in the electronic field to follow the instructions of the patient.

Nevertheless, by the same token this claim, and all of the other claims of the three patents, must be restricted to that which is definitely set forth in the

specification, so that the inventor or his successors in interest will not be permitted to go beyond the frontier of the patent grant. See General Electric Co. v. Wabash Appliance Corp., 304 U.S. 364, at 369, 58 S.Ct. 899, at page 901, in which Mr. Justice Reed, for the Court, observes: "Patents, whether basic or for improvements, must comply accurately and precisely with the statutory requirements as to claims of invention or discovery. The limits of a patent must be known for the protection of the patentee, the encouragement of the inventive genius of others, and the assurance that the subject of the patent will be dedicated ultimately to the public.[7] The statute seeks to guard against unreasonable advantages to the patentee and disadvantages to others arising from uncertainty as to their rights.[8] (1) The inventor must 'inform the public during the life of the patent of the limits of the monopoly asserted, so that it may be known which features may be safely used or manufactured without a license and which may not.'[9] (2) The claims 'measure the invention'.[10] (3) Patentees may reasonably anticipate that claimed inventions, improvements, and discoveries, turning on points so refined as the granular structure of products, require precise descriptions of the new characteristic for which protection is sought. In a limited field the variant must be clearly defined."

In United Carbon Co. v. Binney & Smith Co., supra, 317 U.S. at page 236, 63 S.Ct. at page 168, Mr. Justice Jackson said: "The statutory requirement of particularity and distinctness in claims is met only when they clearly distinguish what is claimed from what went before in the art and clearly circumscribe what is foreclosed from future enterprise. A zone of uncertainty which enterprise and experimentation may enter only at the risk of infringement claims would discourage invention only a little less than unequivocal foreclosure of the field."

With that understanding of the construction to be given to the claims, and conceding validity of the claims, there are a number of reasons why the conclusion is forced that the beam power tube does not invade the plaintiffs' rights.

First, the beam power tube is not a triode, and all the claims in suit of patents '525 and '527 are limited to triodes. The accused tubes must be considered either as tetrodes or as pentodes (if the beam plates are regarded as a modified form of the suppressor grid of the prior art pentode tubes).

In seeking to prove infringement, the plaintiffs relied on the observable parts of the structure of the challenged tubes and on the operations of the tubes as illustrated on the graphs of curves and families of curves. The proof as to operation was necessarily limited for one cannot see electrons, and such photographs as were taken of tubes in operation are not too revealing. Hence during the trial of this case, which carried over a period of a month and a half during which seventeen hundred pages of testimony were taken, and approximately three hundred exhibits were offered, much of the proof was concerned with the operation of tubes as disclosed by the graphs of curves. The burden is, of course, on the plaintiffs to establish infringement. The tubes themselves were offered in evidence and their internal construction is illustrated by the defendant's physical model, Exhibit J (Model Tube Type 7 C 5). This type is graphically shown in Exhibit 52, as well as in Fig. 1 of the tube chart, Exhibit 53 [11].

We find in the defendant's tubes the cathode, control grid, screen grid, beam plates

7. Cf. The Incandescent Lamp Patent, 159 U.S. 465, 474ff, 16 S.Ct. 75, 40 L.Ed. 221.

8. (1) See Brooks v. Fiske, 15 How. 212, 215, 14 L.Ed. 665.

9. (2) Permutit Co. v. Graver Corp., 284 U.S. 52, 60, 52 S.Ct. 53, 76 L.Ed. 163; Grant v. Raymond, 6 Pet. 218, 247, 8 L. Ed. 376.

10. (3) Continental Paper Bag Co. v. Eastern Paper Bag Co., 210 U.S. 405, 419, 28 S.Ct. 748, 52 L.Ed. 1122.

11. The similarity of the nine types of defendant's tubes has led counsel for the plaintiffs to write in his brief: "If one tube infringes, all infringe." Correspondingly it should be noted that if one tube under consideration does not infringe, none of the others does.

and anode. The cathode is at zero potential, the control grid at variable negative voltage, the screen grid positive voltage, the beam plate zero voltage, the anode variable positive. The cathode is heated in the usual way to boil off a cloud of electrons. The control grid has support rods negatively charged. There is formed a stream of electrons flowing away from the cathode. It is claimed by the plaintiffs that the beam plates exert a supplementary focusing effect, adding to what Kelley said was the main focusing effect of the two side rods.

The defendant's position that there is a difference between the '525 and '527 patents and the beam power tubes of the defendant presents the decisive issue. The Harries triode, as defined in the drawings and specification is not designed for practical purposes, for the tube of commerce could not have a movable anode. The accused tubes certainly have not a movable anode nor a cathode focusing hood.

The beam power tubes, borrowing apparently from the prior art, have a control grid and two side support rods. Such rods are shown in United States patent to Krahl, No. 1,869,568; to Robinson, British patent No. 364,098; in the article of April, 1930, in Electronics; in the article of July, 1931, in Radio News, and in the R.C.A. 238 tube of 1931. Patents '525 and '527 disclose no such structure. Nor is the structure of Figs. 17 and 18 of '525, showing a tube suitable for use as a frequency multiplier, as described in Harries British patent No. 328,680, with deflecting plates 20, present in the defendant's tubes.

Moreover within the limitations of these patents, I think the plaintiffs have failed to show that the beam power tubes have a path of limited cross-sectional area. The defendant's tubes have not the length of electronic stream of the jet variety of Harries, nor is the ratio of cross section of beam to length of stream such as Harries taught. Another difference which must be admitted to exist is that in the defendant's tubes there is an alignment of control grid wires and screen grid wires which facilitate the passage of the stream of electrons in parallel planes. This arrangement prevents the electrons from striking the wires of the screen grid, and facilitates their passage to the anode. The electronic stream from the cathode thus passes between the two grid support rods, which are continually increasing or decreasing in potential with the result that the stream is widened or narrowed depending upon the incoming signals. This is an operation different from the unchanging potential of the Harries electrode. Other advantages of alignment of the grid wires are discussed in detail in the article on "Beam Power Tubes" by O. H. Schade (Plaintiff's Exhibit 135).

The defendants insist that their beam power tubes are but a modification of the prior art pentodes, and that any difference between them is one not of kind but of degree. For the suppressor grid of the pentode there is substituted the beam plates. These plates function as a suppression means. Herold compared the removal of beam plates from the beam power tubes with the removal of suppressor grids from pentodes and found that the removal of these zero-potential electrodes had the same effect upon the operations in producing secondary electron effects. Herold demonstrated too that the beam plate tube functioned in the same way as the prior art 238 tube in respect to any change in the positioning of the anode from its nearest electrode.

In respect to the matter of saturation, a debatable issue presents itself. The invention, for example, as defined in claim 1 of '525, refers to the method of controlling a stream of electrons by energizing the cathode to supply electrons, applying positive potentials to the auxiliary electrode and anode to the end that the stream is directed to the anode over a distance between the auxiliary electrode and the anode "at least equal to about the critical distance at which the anode break-down voltage at which the anode current becomes substantially saturated is in the neighborhood of the minimum". The plaintiffs argue that the beam power tubes show substantially saturated currents because, as they sought to prove, there is no substantial rise in the current after a certain voltage is reached. Herold takes an entirely different position. He is of opinion that the beam power tubes do not have saturated currents since their currents

rise as much as one hundred per cent from the "saturation point" selected by Harries. The controversy resolves itself into an interpretation of plaintiffs' Exhibit 53 (Fig. 7) and defendant's Exhibit D. In both of these exhibits the same curve of operation was attempted to be drawn. Herold said that the point of break-down voltage, as selected by Harries on defendant's Exhibit D, is at approximately 14 volts (anode volts) and at 25 milliamperes of anode current. Herold points out that the current does increase substantially from 25 milliamperes so that when the curve has reached 250 screen grid voltage, the current is almost 50 milliamperes. This would be, as he said, approximately one hundred per cent beyond the point which Harries found as the saturation point. To determine the meaning to be attached to the term "substantially saturated" recourse must be had to the specification of '525.

"Saturated" is first used in making reference to Fig. 6 of the patent. Fig. 6 shows the form of the curve connecting the anode voltage and the anode current, and the current to the accelerating grid. Harries writes, referring to this figure: "For purposes of explanation it will be assumed that the distance d is about 7 cm., the voltage of the accelerating eletrode 4 is about 200 and that the anode voltage is gradually increased from zero upwards as shown in Fig. 6. It will be seen that the entire space current goes to the accelerating electrode when the anode voltage is below a certain point. When this point has been reached the anode current rises fairly suddenly to a saturated value, the grid current dropping by a proportional amount. Once this point has been passed, the anode current and the grid current are saturated and the grid current is only a small portion of the total. The anode voltage at which the anode current becomes saturated will be referred to as the 'break-down voltage' of the tube."

Further on, in referring to the curve illustrated in Fig. 7, the specification recites: "When the distance d is very small (say 1 cm.) in the tube shown in Fig. 1, the secondary radiation from the anode 5, when $E_{acc}$ is between 100 and 300 volts, will be sufficient to cause a large drop in the value of the anode current when the anode voltage is below that of the accelerating electrode 4. Hence at this distance the 'anode breakdown voltage' at which the anode current becomes saturated does not occur until the anode voltage is greater than the accelerating voltage. If, however, the anode is placed a little further from the accelerating electrode 4 (say at 3 cm.), this distance will be too great for secondary radiation which is produced to travel back to the accelerating electrode 4. Then the anode current will rise to a saturated value, and at an anode voltage very much less than that of the accelerating electrode. This corresponds to the lowest point of the curve in Figure 7. If the distance d is increased to say 4 or 5 cm. the secondary radiation will still have no effect on the result, but, in accordance with the considerations already outlined, the breakdown anode voltage of the tube will be comparatively high. This corresponds to the right-hand part of the curve in Figure 7."

The term "saturated condition" is found again in line 36, p. 4, column 1, of '525, but throws no further light on the meaning of the term, nor is there any other language in the specification which adds to an interpretation. Perhaps the best statement is that which in defining "critical distance" explains it in the terms of anode break-down voltage, as occurring when the anode current becomes "substantially saturated" in the neighborhood of the minimum.

Plaintiff's expert witness Kelley, in defining the term "saturation" as he understood it in the electrical art, said that it refers "to that condition which, to use the present discussion as an example, in which no further increase occurs, in this case of the current, of any substantial amount despite the fact that the attractive force has been increased. It has exhausted all that it is going to get, and therefore it is a saturated condition."

It was at that time that I spoke of the saturation point in economics, where in the field an added effort would not yield a proportionate result. Then Mr. Kelley added: "I think that is very apt, your Honor, and I would say that would not only not yield a

proportionate result, but would yield very little more result because sometimes these curves have a slight upward slope, but I think that fits very well."

But even though the term "saturated" may be defined, "substantially" is not. Herold testified: "It is of course always difficult to define a term such as 'substantial' or 'substantially no', but I can tell you my point of view would be one of a practical tube engineer, and I would say that if the difference was so slight that if it were present or if it were not present it would make almost a negligible difference in the commercial salability or in the power output which you would measure on the tube, I would consider it as no substantial rise. In other words, I would consider that a practical limit might be of the order of three to five or six per cent; if it rose to more than that I would say it was a noticeable rise which would be exhibited in that tube by a three to five per cent lower output than an ideal tube which would have no rise and have a horizontal line going down to zero voltage."

Further reference to the specification may not be amiss. In Fig. 25 a typical curve between the anode current of the tube such as that shown in Figs. 17 and 18, and the anode voltage is shown. And it is apparent that the curve becomes practically horizontal after the anode break-down voltage point.

On balance, therefore, and by that I mean taking the relative positions of the parties in support of their contentions, I am led to accept Herold's interpretation as being a practical one in the art. Thus it would follow that if the six per cent test be adopted, the beam power tubes do not infringe because their currents increase as much as one hundred per cent beyond the "saturation" point found by Harries, and consequently the beam power tubes do not have the break-down voltage of the claims.

For the foregoing reasons, reciting both differences in structure and methods of operation, as well as legitimate appropriation from the domain of the prior art, I must reach the conclusion that the beam power tube does not infringe the '525 and '527 patents.

The '526 patent is for a different aspect of the Harries invention which claims the apparatus with the addition of a control grid between the cathode and the screen grid. It will be recalled that claims 5, 6, 9 and 10 are in issue, and the plaintiffs selected claims 9 and 10 as typical. This patent differs from patents '525 and '527 in making specific provision of a control grid. The control grid consists of a mesh so arranged as to surround three cathode filament legs so that the "electron stream from the filament to the accelerating electrodes and anode may be controlled in accordance with the potentials" of the control grid. Harries says: "An important part of my invention is in the fact that I have shown that such mesh electrodes may be made to give satisfactory results in the production of streams of electrons which are of the 'jet' type, i. e. are of comparatively great length in comparison with their cross section."

In Fig. 3, which shows details of the control grid, we find that that grid is divided into separate compartments which, as the specification states, "tend to cause this to exercise a focusing action upon the electrons because this is usually at a negative potential in respect to the filament. This focusing action is due to the plate 10, and the control grid 6 therefore exercises a focusing action as well as a controlling effect on the stream."

Claims 5, 6, 9 and 10 first appeared in the specifications as claims 117, 118, 121 and 122, April 3, 1936 amendment. Fig. 11 and the description thereof in the specification were also part of this amendment. Each claim has the specific limitation of focusing by "means incorporated in said first grid electrode to confine said electron stream to a path of limited cross section". Prior to this amendment there was nothing in the application about grid support rods of the control grid having any focusing effect. There was only the focusing effect of the plates 10. Before this amendment was made, in April, 1936, a British patent application had been filed for a beam power tube in August, 1933. The patent thereon issued to Schoenberg, February 4, 1935 —British patent No. 423,932. The corres-

ponding United States patent to Schoenberg, No. 2,107,519, on which the application was filed July 27, 1934, was issued February 8, 1938. Apparently Harries had amended '526 in order to bring in the claims which are at issue. The defendant contends that the claims in issue, if interpreted as including the control grid support rods as a focusing means, have no basis in the application as originally filed. If that be so, then the claims must fall, Schriber-Schroth Co. v. Cleveland Trust Co., 305 U. S. 47, 573, 59 S.Ct. 8, 83 L.Ed. 34, or their scope narrowed to the showing of the invention as originally described, and to such implications in such description as the inventor was entitled to.

The beam power tubes have but two grids, and zero potential electrodes in the form of beam plates which are outside of the electron stream; but the focusing in the beam power tubes is quite different from that of the '526 patent because short streams and not the long thin streams, which Harries sought, make up the electronic stream. The beaming in the beam power tube is brought about by the support rods of the control grid and is also aided by the aligned grid wires which have heretofore been referred to. In the alignment of the wires of the control grid and the screen grid the defendant apparently follows the Schoenberg British specification and the United States patent to Schoenberg. Beam power tubes are licensed under this U. S. Schoenberg patent as well as under Schade United States patent No. 2,107,520, filed February 26, 1936 and issued February 8, 1938.

Since the defendant is a licensee under Schoenberg it was entitled to use all that Schoenberg discloses in respect to the tetrode therein described and defined, though that in and of itself would not of necessity avoid infringement of a valid patent.

Schoenberg, in the British patent, says: "a discharge device of the kind specified comprises an auxiliary electrode located at least mainly clear of the path of the electron stream, and adapted when maintained at a low potential, for example at cathode potential, to modify the electrostatic field in the space between the anode and the screening electrode, the effect of this modification being such that with the control grid and the auxiliary electrode at cathode potential, and the screening electrode at a potential equal to the main anode potential, the anode voltage-anode current characteristic exhibits no inflection."

With the device Schoenberg prevented a flow of secondary electrons from the anode to the screening electrode and he claimed that that result was obtainable at other positive values than that which has been indicated hereinbefore.

It must be observed that the '526 patent is for a tube having a long jet-type electron stream. The length is great in proportion to the cross section. This is not present in the beam power tube. Also it is to be noted that for the reasons set forth in the discussion of alleged infringement of '525 and '527 patents, the beam power tube does not have the "substantially" saturated current of the Harries invention.

Schoenberg also, in the complete specification, discusses the production of a focusing or concentrating effect upon the electron stream in the screen to anode space arising from a modification of the potential distribution in that space produced by the auxiliary electrode.

He also described the desirability in the plotted curve of operation of the knee which "should be as sharp as possible and should occur at as low a voltage as possible, and that there should be no inflection or kink, or at least no marked inflection in the characteristic."

Schoenberg was concerned too with the electron shadow which is caused in the regions of the space opposite the grid supporting rods. He said in the provisional specification: "The flow of secondary emission current may be prevented according to the present invention by providing in the shadow zone a shield of insulating material adapted to intercept secondary electrons which might otherwise reach the screening electrode."

Both in pentodes of the prior art and the challenged beam power tubes a zero potential electrode is located between the screen grid and the anode to aid in forming a potential barrier. In the beam power tubes

this electrode is the beam plate. In the pentode it is the suppressor grid. One may be more effective in suppressing secondaries than the other, but the proof establishes that both do suppress secondaries, though perhaps in varying degrees.

The equivalence of the pentode and the beam power tubes, as accepted in the art, was set forth by Briggs, a radio engineer associated with the Hytron Radio & Electric Corporation. He also explained that the beam plate construction is simpler mechanically and cheaper to construct than the suppressor grid of the pentode.

Steen, an electrical engineer associated with the Sylvania Electric Products Co., Incorporated, had very large experience in the testing of tubes, both by operating them and taking the family characteristics to see whether they conformed to manufacturing standards and specifications. His company, the Sylvania, manufactured pentodes prior to 1936, and also beam power tubes. Their beam power tubes had aligned grid wires, and also in the 6V6 tube had beam plates. They also had a 6V6G beam power tube with a so-called suppressor grid. Under cross-examination, in answer to the question: "Do you feel from your experience that it would be practically impossible to tell the difference between the pentode and the beam plate tube from the characteristics?" he said: "Yes, I think you would have to have some very good instruments in order to determine the difference between the operation of these tubes."

Herold said of the 1931 standard type 238 tube in which the anode distance from the screen is .097, shown in defendant's Exhibit S-1, 1(a), there is a slight suggestion of a kink at the lower left hand side. Herold compared this tube with modifications, varying anode distances, and found that the best tube was between the anode distance in the 238 tube and one showing a distance of .216. He believed that almost any of the tubes charted would prove commercially acceptable.

Herold then performed a very interesting test. He removed from the pentode 238 the suppressor grid and again varied the anode diameter with the screen distances varied from 0.136, 0.216, 0.294, 0.404 and 0.529,

with varying anode diameters respectively 0.465, 0.625 and 0.780, 1.0 and 1.250. All these distances are in inches. He was of opinion that the tube with anode distance 0.294 has "a very acceptable shape of tube characteristic".

His conclusion was that one could suppress the secondaries with small anode by putting a suppressor grid in, or by increasing the size of the anode and removing the suppressor grid.

■ On the basis of the reasons set forth I must reach the conclusion, as I did with respect to patents '525 and '527, that the defendant does not infringe '526.

■ Among other defenses raised by the defendant is that of laches. The complaint was filed in November, 1947. The patents had been issued eleven years earlier. There was no evidence that notice of infringement had been given to the defendant during that intervening period. From 1937 the defendant has sold great numbers of alleged infringing broadcast receiving sets containing beam power tubes. Such tubes were sold in the United States from about July, 1936, to date, and were made by many tube manufacturers. However, I do not know that the defendant's position has been impaired in respect to the extent that it believed itself free to go ahead with the manufacture and the sale of beam power tubes for this period of years. In the absence of clear proof of a changed position by tube manufacturers in general and the plaintiffs in particular, the defense is one not lightly to be recognized. See Baltzley v. Spengler Loomis Mfg. Co., 2 Cir., 262 F. 423; Drum v. Turner, 8 Cir., 219 F. 188.

But the plaintiffs' failure to act in the period of time designated must be interpreted in the light of world events during that time. Harries was living in England during the period of World War II, actively engaged in war effort. I am in wholehearted agreement with Alliance Securities Co. v. De Vilbiss, 6 Cir., 41 F.2d 668, at pages 669–670, in which it was said: "It has been frequently held that the unusual years during and immediately after the great war constituted a period in which all reasonable postponement and suspension

of litigation was a public duty." See also Mills Novelty Co. v. Monarch Tool & Mfg. Co., 6 Cir., 49 F.2d 28.

The defendant may have a decree dismissing the complaint in conformity with the foregoing opinion.

Appropriate findings of fact and conclusions of law will also be filed.