## METROPOLITAN WIRE CORPORATION

v.

## FALCON PRODUCTS, INC., et al.

### Civ. A. No. 76-2747.

United States District Court, E. D. Pennsylvania.

Dec. 21, 1981.

---

Jerome Lipman, Robinson, Greenberg & Lipman, Philadelphia, Pa., Abraham Friedman, Friedman, Goodman & Teitelbaum, Brooklyn, N.Y., for plaintiff.

Alan H. Bernstein, Caesar, Rivise, Bernstein & Cohen, Philadelphia, Pa., for defendant.

## MEMORANDUM

GILES, District Judge.

This is an action for the infringement of United States Patent No. 3,424,111 (hereinafter the '111 patent) relating to readily assemblable and adjustable shelving. The patent was issued on January 28, 1969, to Louis Maslow, founder and former President and Chairman of the Board of the plaintiff, Metropolitan Wire Corporation ("Metropolitan"). Metropolitan seeks damages and a permanent injunction against further infringement. Jurisdiction arises under the patent laws of the United States. 28 U.S.C. § 1338, 35 U.S.C. § 281.

The defendant, Falcon Products, Inc. ("Falcon"), has raised several defenses. In addition to denying patent validity and infringement, Falcon has interposed the affirmative defenses of laches and estoppel. By agreement of the parties, the issues of laches and estoppel were severed for separate prior trial and decision.

This memorandum constitutes my findings of fact and conclusions of law in accordance with Fed.R.Civ.Proc. 52(a). For the reasons which follow, Falcon's motion to dismiss will be denied and I hold that Falcon has not proved the affirmative defenses of laches and estoppel.

## I. FINDINGS OF FACT

### A. *The Parties*

1. Plaintiff, Metropolitan Wire Corporation, is a New York corporation, having its principal place of business in Wilkes-Barre, Pennsylvania.

2. Plaintiff was formerly known as the Metropolitan Wire Goods Corporation but is now known as Metropolitan Wire Corporation. There is no significance in this name change as far as the present case is concerned (T 1.24).[1]

3. Defendant, Falcon Products, Inc., is a Delaware corporation, whose Hodges division has a place of business in Philadelphia, Pennsylvania.

4. In 1973, Falcon acquired William Hodges & Co., Inc. ("Hodges"), a Pennsylvania corporation which · no longer exists. All assets of Hodges were taken over by Falcon (T 1.21).

5. Louis Maslow was the founder of Metropolitan and its President and Chairman of the Board until June, 1971 (T 1.26). He was also the named inventor of the '111 patent. He died in December, 1973 (T 1.29).

6. Sol Kesilman, president, Milton Kravitz, treasurer, and Hyman Penn, secretary, were the officers of Hodges and together controlled it until the acquisition of Hodges by Falcon in 1973. They were the named inventors of the allegedly infringing patent (TX 28).

### B. *Developments Up to 1970—The Prior Litigation*

7. By approximately 1965, Metropolitan and Hodges were direct competitors in the business of metal shelving and dishwasher racks (T 1.25).

8. In 1967, Metropolitan filed a patent infringement suit against Hodges with reference to certain Metropolitan patents relating to plastic dishwasher racks (T 1.37). The named inventor on all Metropolitan patents involved in the 1967 patent action is Louis Maslow. The 1967 suit was ultimately settled by an agreement for Hodges to pay Metropolitan $10,000 (which was paid) (T 1.39) and a Stipulation of Dismissal, dated June 1, 1971 (T 1.38).

9. On January 28, 1969, the '111 patent was issued to Louis Maslow (TX 1).

10. Prior to the shelving covered by the '111 patent, post-type shelving was well known and widely sold (T 1.46). It was necessary to use a setscrew and a screwdriver or other tightening tool to lock and hold the shelving in place (T 1.46).

11. Prior to acquiring the '111 patent, Metropolitan had begun to sell its post-type shelving identified by the trademark Erecta Shelf (T 1.60).

---

1. References herein to the transcript will be by the letter "T" and to trial exhibits by the letters "TX."

12. Metropolitan's Erecta Shelf shelving is assemblable without tools (TX 1).

13. In 1969, Hodges developed a proposed post-type shelving and consulted with its patent counsel to determine whether its design would infringe upon Metropolitan's patent (T 1.61, TX 37).

14. Hodges' patent counsel became aware of the '111 patent and made a study of it in 1969 (T 161).

15. Patent counsel advised Messrs. Kesilman, Kravitz, and Penn during mid-1969 that their proposed type of shelving would not infringe upon any arguably valid claim [2] under Metropolitan's patent and therefore Hodges had the right to make and sell its proposed post-type shelving, the Hodges Post Master (T 1.65).

16. Messrs. Kesilman, Kravitz, and Penn made the decision to make and sell the Hodges Post Master shelving after concluding that there was a substantial potential market for the product, and relying upon the advice of their patent counsel that the Post Master shelving could not be blocked by legal action on the part of Metropolitan (T 1.71).

17. The Hodges corporation went public in 1969 in order to finance the manufacture of its new product (T 1.71).

18. Hodges was unable to produce and sell post-type shelving in 1969 and 1970 because it lacked sufficient space to set up production facilities (T 1.72).

19. Hodges made the decision to move to a new facility in March of 1969 (T 1.75).

20. In early 1971, Hodges moved to a new and larger plant in the Philadelphia Industrial Park area where it set up production facilities for the post-type shelving. The primary reason Hodges acquired the new plant was to go into the business of post-type shelving (T 1.75).

21. By April of 1971, Hodges had spent substantial sums of money for production machinery needed for the manufacturing of the Hodges post-type shelving (TX 23, T 1.77).

22. The foregoing actions were taken by Hodges solely in reliance upon its patent counsel's advice that the Post Master design did not infringe Metropolitan's patent (T 2.80).

C. *The 1971 Chicago Trade Show*

23. The Hodges Post Master shelving first was exhibited for sale to the trade at the annual trade show in Chicago in May, 1971 (T 1.74).

24. Both Hodges and Metropolitan had exhibition booths at that show (T 1.87).

25. Louis Maslow personally visited the Hodges display area at the 1971 Chicago trade show to inform Hodges that Metropolitan had accepted the settlement of the then pending litigation between the parties (*See* Finding # 8) (T 1.87). At that time Louis Maslow inspected the Hodges products, including the Hodges Post Master (T 1.90–1.91). Maslow congratulated Kravitz, who was in the Hodges display area at that time, on the new Post Master shelving (T 1.91). Maslow made no comment as to whether he thought the Post Master design infringed upon the '111 patent.

26. Hodges could not have reasonably relied on Maslow's congratulations as evidence of the fact that Metropolitan had determined that the Hodges design did not infringe upon its patent.

27. Messrs. Richard Maslow, Metropolitan's president as of June, 1971, and John Bourke, current vice president of sales, also inspected the Hodges Post Master shelving sometime during the 1971 Chicago trade show (T 1.86–1.87).

28. Their examinations were insufficient to put them on notice that even though the Post Master required screws (unlike the Erecta Shelf) it infringed the '111 patent.

29. No employee of Metropolitan, qualified or in authority, in any way misled the

---

**2.** Defendant's patent counsel believed that Claim 1 of the '111 patent was invalid and that therefore Metropolitan could not successfully prove infringement under that claim. Therefore, patent counsel's opinion of non-infringement was premised in part on the belief that not all of the claims under the '111 patent are valid (TX 37 at 5).

defendant into believing that the patent had been abandoned or that Metropolitan was acquiescing in the infringement.

30. The defendants did not reasonably rely upon the conduct of the plaintiff for the continuance of the infringement (T 2.44).

31. Hodges would have continued to rely on patent counsel's advice even if Louis Maslow had indicated that the Post Master infringed on his patent (T 2.45).

### D. Events After the 1971 Chicago Trade Show

32. On July 11, 1972, United States Patent No. 3,675,598 was issued to Kesilman, Kravitz, and Penn. They assigned it to Hodges. The patent covered the Post Master shelving design (TX 28).

33. No significant purchases were made by Hodges in 1972 to further expand the production of the Post Master shelving (T 1.80).

34. In 1973 and thereafter, Hodges purchased expensive equipment (Channel Welders and Mig-Welders) to expand production of their Post Master shelving (T 2.14–2.16).

35. In December, 1973 Louis Maslow died. Following his death, Metropolitan hired Frederick Becker, an engineer, for the position of Director of Engineering (T 2.218). Within a few days after starting with Metropolitan, Mr. Becker saw the Hodges Post Master shelving at the 1974 Chicago trade show (T 2.128). Becker told Richard Maslow that he thought the Post Master might be infringing the '111 patent.

36. Metropolitan should have made reasonable inquiry as to the possibility of infringement as of May 1974. It is chargeable with knowledge of the alleged infringement as of May, 1974.

37. After examining the Hodges Post Master shelving in Chicago in May, 1974, and prior to the July, 1975, correspondence between the parties, (See Finding # 40), Becker secured a sample of the Post Master, familiarized himself with it, and concluded that it infringed the '111 patent (TX 53 at 34).

38. Becker mentioned to Richard Maslow that infringement by the Post Master design upon the '111 patent should be investigated but no further action was taken at that time (TX 35 at 36).

39. Charles Brown, who was Director of Manufacturing for Metropolitan in 1974 and who became Vice President of Marketing in 1975, also suggested that the Post Master infringed upon the '111 patent about the same time Becker did. Brown was an engineer (TX 35 at 38).

40. In July of 1975, Metropolitan, through its attorneys, wrote a letter to Hodges (by then a division of Falcon) objecting to certain acts of alleged deceptive advertising on the part of Hodges with reference to the Post Master shelving (TX 7). A principal objection was that the Hodges advertisement did now show the presence of the set-screw which is used in the Post Master shelving (T 2.27). Metropolitan did not say whether it felt that the Post Master design violated the '111 patent. The Metropolitan objection concerning alleged deceptive advertising was resolved without recourse to litigation (T 2.28).

41. Becker was one of the first to complain to Richard Maslow about Hodges' alleged deceptive advertising (TX 53 at 29). Prior to the time of the Hodges' alleged false advertising, key figures at Metropolitan thought that the set-screw was an essential part of the Hodges Post Master shelving (TX 53 at 31).

42. This suit was filed in August, 1976.

## II. DISCUSSION

■ Laches and estoppel are equitable defenses whose appropriateness must be decided upon the facts of each particular case. Though similar concepts, they are distinct defenses. *Menendez v. Holt,* 128 U.S. 514, 9 S.Ct. 143, 32 L.Ed. 526 (1888); *Studiengesellschaft Kohle mbh v. Eastman Kodak Co.,* 616 F.2d 1315, 1325 (5th Cir. 1980); *Minnesota Mining & Mfg. Co. v. Berwick Industries, Inc.,* 373 F.Supp. 851 (M.D.Pa. 1974), *aff'd,* 532 F.2d 330 (3d Cir. 1976). Laches forecloses retroactive relief; estoppel bars prospective relief.

■ To sustain a defense of laches the defendant must prove that there was an unexcused delay by the plaintiff in asserting its known rights, and that the defendant was materially prejudiced by the delay. *Jenn-Air Co. v. Penn Ventilator Co.*, 464 F.2d 48 (3d Cir. 1972). The question of delay is one of fact, *Minnesota Mining & Mfg. Co. v. Berwick Industries, Inc.*, 532 F.2d at 334, which must be measured from the time at which the plaintiff knew, or in the exercise of reasonable diligence, should have known, about the defendant's alleged infringements. *Johnston v. Standard Mining Co.*, 148 U.S. 360, 370, 13 S.Ct. 585, 589, 37 L.Ed. 480 (1893).

■ The defendant contends that Metropolitan should be charged with such knowledge as of May 22, 1971, because on that date Louis Maslow, Metropolitan's president and Chairman of the Board, examined the allegedly infringing shelving at a tradeshow display and congratulated Kravitz, an executive at Hodges, on the new line of shelving. The defendant argues that Maslow's examination was sufficient to put Metropolitan on notice of the allegedly infringing activity and therefore it had a duty to inquire further into the possibility of infringement as of that time.

The defendant's argument necessarily fails because *Johnston, supra,* only requires the court to charge the plaintiff with such knowledge when "the facts *already known* by [it] were such as to put upon a man of ordinary intelligence the duty of inquiry." *Id.* (Emphasis added). The facts known to Maslow at the time he inspected the Post Master were not such as to put him on notice that further inquiry was necessary.

He knew that post-type shelving traditionally had required setscrews. He also knew that he had designed his shelving with the specific purpose of obviating the need for screws and tools. Thus, the most plausible conclusion is that, seeing setscrews in the Hodges design, Maslow decided (although perhaps incorrectly), that since Hodges was still relying on the prior art it could not possibly be infringing on the '111 patent. Furthermore, considerable weight is given to the fact that Metropolitan is suing under the doctrine of equivalents [3] and not for literal infringement. Maslow cannot reasonably be charged with knowledge of that doctrine. Therefore, his examination of the Post Master was insufficient to put him, or more importantly, Metropolitan, on notice of the possibility of infringement.[4]

■ However, Metropolitan is charged with knowledge of the infringing activity as of May, 1974, when its new director of engineering suggested that further investigation be made into the possibility of infringement. (*See* Finding # 37). Having found the period of delay to be approximately two years, the court must determine whether the defendant has shown the delay to be unreasonable or inexcusable.

■ Traditionally, courts have looked to the statute of limitations on recovery of damages [5] as a frame of reference in evaluating the unreasonableness of the delay. *Studiengesellschaft, supra; TWM Manufacturing Co., Inc. v. Dura Corp.*, 592 F.2d 346 (6th Cir. 1979); *General Electric Co. v. Sciaky Brothers, Inc.*, (6th Cir.) 304 F.2d 724, 727; *Whitman v. Walt Disney Production Co.*, 263 F.2d 229, 231 (9th Cir. 1958). Although several cases have stated in dicta

3. The doctrine of equivalents, in its simplest form, states that where "two devices do the same work in substantially the same way and accomplish substantially the same result, they are the same, even though they differ in name, form, or shape." *Graver Mfg. Co. v. Linde Co.*, 339 U.S. 605, 609, 70 S.Ct. 854, 856, 94 L.Ed. 1097 (1950) quoting *Machine Co. v. Murphy*, 97 U.S. 120, 125, 24 L.Ed. 935 (1878).

4. For the reasons stated above, Richard Maslow and John Bourke (See Finding # 27) are also not chargeable with knowledge of the al-

leged infringement at the time of the 1971 Chicago trade show. It should also be noted that neither has been shown to have had a detailed knowledge of the '111 patent comparable to that of Louis Maslow.

5. The Patent Code has a six-year statute of limitations: "Except as otherwise provided by law, no recovery shall be had for any infringement committed more than six years prior to the filing of the complaint or counterclaim for infringement in the action." 35 U.S.C. § 286.

that laches may bar recovery even within the statutory period, *Studiengesellschaft, supra; Whitman v. Walt Disney Productions, Inc., supra,* very few courts have actually applied laches where the delay was less than six years. In most cases where the defense of laches has been successfully established, the period of delay was over six years. *Johnson & Johnson v. W. L. Gore & Assoc.,* 436 F.Supp. 704 (D.Del.1977). The few cases where laches was applied where suit was brought within the statutory period are readily distinguishable from the case at bar.

In *Lukens Steel Co. v. American Locomotive Co.,* 197 F.2d 939 (2d Cir. 1952), the plaintiff steel company designed a product incorporating its patent for the defendant, one of its regular customers. Lukens created the design fully aware that the defendant's use of the design would infringe Lukens' patent, yet Lukens never asserted its rights or even suggested that it would assert its rights until five years after it designed the product. Meanwhile, the defendant manufactured the product and spent over one-half-million dollars expanding its production facilities. Considering the plaintiff's intimate involvement in the development of what it knew to be an infringing product, the court held that the five-year delay was unreasonable. The court explained:

> It is true that only some five years elapsed between the time Lukens learned of the infringement and the time it took affirmative action, while the period in most of the decided cases is longer. But in the usual case the patentee merely delays bringing suit for an unreasonable time after he learns of the infringement. Here the assignee of the patent presented a design embodying the patent to the infringer knowing he would use it to manufacture the frames himself, and then stood idly by while the infringer embarked on a costly expansion program. In these circumstances the five year delay was unreasonable and the defense of laches is available . . . .

197 F.2d at 941 (footnotes omitted).

The court in *Lukens* plainly found that laches should not be applied where the delay was shorter than the limitation period unless the circumstances surrounding the delay were highly unusual. In the instant case there are no circumstances that warrant special consideration. At the worst, plaintiff delayed bringing suit for two years.

*Advanced Hydraulics, Inc. v. Otis Elevator Co.,* 525 F.2d 477 (7th Cir.), *cert. denied,* 423 U.S. 869, 96 S.Ct. 132, 46 L.Ed.2d 99 (1975), presents a similar situation where the delay, though within the statutory time period, was found to be inexcusable. There the plaintiff had sent a notice of infringement which threatened immediate prosecution. The defendant answered the notice with a denial of infringement which remained unanswered by the plaintiff for a period of over five years. While a delay of five years was not in itself inexcusable, the fact that it followed a threat of immediate prosecution made it so. Unlike *Advanced Hydraulics,* the facts here do not demonstrate the unreasonableness of a two-year delay.

It is clear from these cases that while laches may be applied within the limitations period, the circumstances in which it actually has been applied are exceptional. The two-year delay in the case at bar has not been shown to have been unreasonable under the circumstances. Therefore, the defense of laches must be denied.

■ Falcon has also failed to establish the defense of estoppel. The elements of estoppel are: (1) infringement; (2) knowledge by the owner of the infringement; (3) misleading conduct by the owner which suggests he has abandoned the patent or acquiesced in the infringement; and (4) reliance by the infringer on the conduct. *Minnesota Mining & Mfg. Co. v. Berwick Industries, Inc.,* 373 F.Supp. at 869. I assume, arguendo, the first element, *infringement,* for purposes of this severed trial. The second element, knowledge, has been found as a fact as of 1974. *See* ¶¶ 36–39, *supra.* Falcon, however, cannot sustain a defense of estoppel absent proof of misleading conduct by Metropolitan.

■ Falcon argues that Louis Maslow's congratulations and the subsequent silence over a period of several years were misleading. However, neither Maslow nor Metropolitan had knowledge of the infringement until 1974. Therefore, as to silence before 1974, Falcon has failed to prove an essential element of estoppel.

■ Furthermore, Metropolitan's post-1974 silence and inaction are not misleading conduct. Although silence may be considered misleading conduct, "some evidence must exist to justify an inference that the silence was sufficiently misleading to amount to bad faith." *TWM Mfg. Co. v. Dura Corp.*, 592 F.2d 346 (6th Cir. 1979). Thus, "to bar prospective relief the defendant must show the plaintiff's . . . intentionally misleading silence." *Watkins v. Northwestern Ohio Tractor Pullers*, 630 F.2d 1155 (6th Cir. 1980). In *Watkins*, the court held that silence will not work an estoppel where "at most, the record shows silence by a party who claims not to have known where defendant was or whether or not defendant was infringing." *Id.* at 1160. Here, while the plaintiff knew defendant's location, it had doubts as to whether it was infringing. It was only after the plaintiff's investigation of what it considered deceptive advertising (the screws were not shown in defendant's advertisements) that the plaintiff began to suspect that the defendant's design infringed its patent under the doctrine of equivalents. Plaintiff's silence for two years under these circumstances cannot reasonably be said to be intentionally misleading and, hence, does not constitute bad faith.

Virtually all the cases in which silence has been found to be misleading involve situations where the patentee threatened immediate enforcement of its patent rights but then did nothing for an unreasonably long time.[6] Here, by contrast, there was no notice, and, though plaintiff should have known of its rights for two years prior to the commencement of this action, the court does not find that the period of silence itself was so inexcusably long as to amount to bad faith.

Furthermore, even if there had been misleading conduct by the plaintiff, the defendant has failed to establish reliance. The testimony by Kravitz demonstrates Falcon always relied on the legal advices of its patent counsel that the Hodges design did not infringe the '111 patent, and that Falcon never relied on plaintiff's conduct. During direct examination by defense counsel, Mr. Kravitz testified as to the nature of Hodges' reliance (T 2.43):

Q. I just want to change the sequence here, but it's significant to me that you just testified that you are relying upon statements by Mr. Maslow made at that show in a superficial, or perhaps detailed examination of the structure and from memory said this is not an infringement of my patent, and you relied upon that.

MR. BERNSTEIN: Is that a question?

Q. To continue to build a business.

A. Mr. Friedman, *I think we probably would have continued manufacturing the Postmaster shelving in any case, even if he had told us it infringed*, and we would have talked to patent counsel first, *because patent counsel told us we didn't infringe and we probably would have gone on the basis of our patent counsel*, that basis, but talking man to man with a person that I have known for many years and has known us for many years, and who has told us on other occasions that he thought we were infringing and who did not this time, and by his demeanor and the fact he shook our hands and congratulated us, in that kind of situation, yes, it seemed to us he had no intention at all to sue us.

And the fact that he didn't for two and a half years or so beyond that which he lived, I think bears out our feeling.

.    .    .    .    .

**6.** *See TWM Manufacturing Co., Inc. v. Dura Corp.*, 592 F.2d 346 (6th Cir. 1979) (six years and two months); *Advanced Hydraulics, Inc. v. Otis Elevator Co.*, 525 F.2d 477, 482 (7th Cir.), *cert. denied*, 423 U.S. 869, 96 S.Ct. 132, 46 L.Ed.2d 99 (1975) (five years); *Continental Coatings Corp. v. Metco, Inc.*, 464 F.2d 1375, 1380 (7th Cir. 1972) (seven years); *George J. Meyer Mfg. Co. v. Miller Mfg. Co.*, 24 F.2d 505, 508 (7th Cir. 1928) (over ten years).

Q. In any event, no matter what Mr. Maslow said at that time, you would have proceeded with the business of producing your shelving?

A. Probably; but we would have talked to patent counsel first.

Q. When the suit was started in 1976, you talked to patent counsel, did not you?

A. Of course.

Q. And did patent counsel confirm its view you were not infringing?

A. Yes.

Q. Is there any reason for you to believe that in 1971 it would have had a different opinion because Mr. Maslow said it's an infringement?

A. No ...."

On redirect, Kravitz's testimony only re-inforced the fact that the defendant relied on its patent counsel's advice.

Q. Now, Mr. Kravitz, do you recall on cross examination that Mr. Friedman asked you whether Hodges would have proceeded with the Post Master shelving if Louis Maslow, in May of 1971, had objected?

A. I don't think Mr. Friedman asked me that question. I think I volunteered the information that we would have, after first consulting with patent counsel.

Q. In view of that answer, can you answer a further question, whether you actually considered at the time what you, Hodges Corporation, would have done if Mr. Maslow had objected?

A. Yes. First we would have—

MR. FRIEDMAN: Objection, purely conjectural.

THE COURT: It was covered in cross.

Q. Go ahead.

A. First we would have contacted patent counsel to tell them what had happened.

And, secondly, we would have proceeded, *I'm positive*, with the manufacture of our Post Master shelving.

(T 2.108–2.109) (emphases added).

Mr. Kravitz further testified that the defendant would not have proceeded as vigorously if it had known that the plaintiff thought the Hodges design infringed its patent. By Kravitz's testimony, the defendant was attempting to establish its detrimental reliance on Maslow's words. However, in order for reliance to support a claim of estoppel, the reliance must have been reasonable. *Brown v. Richardson*, 395 F.Supp. 185 (W.D.Pa.1975). As stated above, the court finds any reliance on Maslow's congratulations unreasonable.

Combined with the defendants' behavior, this testimony demonstrates that defendant's confidence in its patent counsel's advice was so firm and substantial that it was willing to risk an infringement suit. Relying on counsel's advice, the defendant went public to finance the development and manufacture of its new product. It moved to a new facility, purchased substantial amounts of equipment and supplies, and launched an extensive advertising campaign. These steps were taken prior to plaintiff's awareness of the new product and therefore could have been taken only in reliance on the advice of patent counsel.

In *Armstrong v. Motorola, Inc.*, 374 F.2d 764, 770 (7th Cir. 1967), the Seventh Circuit held that where the defendant has made an independent determination of non-infringement, it cannot later claim to have relied on the patentee's actions or inactions. While the facts in *Motorola* are slightly different in that the plaintiff there had given the defendant notice of its infringement and had offered the defendant a license which it refused to accept, the defendant there as here took a firm stance as to its belief of noninfringement. Here, the defendants' patent counsel thoroughly examined the '111 patent, compared it to the Hodges design and decided no infringement would result. The testimony above plainly shows that Hodges adopted its patent counsel's determination as its own. Because the defendant had made an independent determination as to the non-infringing character of its product, the defense of estoppel failed in *Motorola*. Likewise, here, Falcon's estoppel argument fails.

For all the foregoing reasons, the Falcon's defenses of laches and estoppel are

denied. The case will be set for trial to consider the merits of the infringement claims and the question of appropriate relief, if any.